ANGELA M. ALIOTO (SBN 130328)
JORDANNA G. THIGPEN (SBN 232642)
**LAW OFFICES OF JOSEPH L. ALIOTO**
**AND ANGELA ALIOTO**
700 Montgomery Street
San Francisco, CA  94111-2104
Telephone: (415) 434-8700
Facsimile: (415) 438-4638

*Attorneys for Plaintiff*
Denise BonGiovanni

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE BONGIOVANNI,<br><br>                              Plaintiffs,<br><br>vs.<br><br>CITY OF OAKLAND, and DOES 1 to 10,<br><br>                              Defendants. | Case No.<br><br>**COMPLAINT FOR**<br><br>1. **Discrimination in Employment Hostile Work Environment – 42 U.S.C. § 1983;**<br>2. **Discrimination in Employment – Retaliation – 42 U.S.C. § 1983;**<br>3. **Harassment – Gender – California FEHA;**<br>4. **Harassment – Sexual Orientation – California FEHA;**<br>5. **Failure to Prevent Employment Discrimination & Harassment – California FEHA; and**<br>6. **Retaliation – California FEHA**<br>7. **Disparate Treatment – California FEHA**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Denise BonGiovanni ("Plaintiff" or "Ms. BonGiovanni"), the Animal Control & Shelter Manager at Oakland Animal Services ("OAS,") was run out of her job by her subordinates, a cadre of bullying animal control officers (ACO's) who abused the animals in their care; labeled Ms. BonGiovanni a "man-hater;" denigrated her sexuality; and created a work environment openly hostile to women.

2.      Plaintiff sues the City for creating a discriminatory and hostile work environment at OAS.

3.      Plaintiff also sues the City for refusing to transfer her to another job when, because of the serious emotional distress she suffered, she could no longer work in the animal welfare field.

4.      Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, and California's Fair Employment and Housing Act, Cal. Gov. Code § 12940 et seq., ("FEHA").

5.      Where applicable, Plaintiff has exhausted fully her administrative remedies.

## STATEMENT OF FACTS

### History of Oakland Animal Services

6.      From its inception until in or about 2015, Oakland Animal Services (OAS) was a division of the Oakland Police Department ("OPD"). The OPD is a chronically-mis-managed department which for decades has been incapable of retaining a police chief, and has, since 2003, been under federal oversight because of police brutality against Oakland's citizenry.

7.      On information and belief, the worst of Oakland's bad cops were taken off street patrol and re-assigned to manage OAS employees. These police officers hired unfit animal control officers, provided them

with little or no training, and allowed them to run wild on Oakland's streets.  Basic standards of animal care and professional employment duties were ignored.  OAS employees, who are law enforcement officers who possess the power to arrest, abused their power; and many complaints were lodged against the department and its officers, including in public forums and otherwise.

8.      In or about 2009, the City, attempting to reform the department, appointed Megan Webb as OAS's director while it was still under OPD.  In addition, in or about 2012, OAS was transitioned out of OPD to become a stand-alone agency.  Unfortunately, Ms. Webb faced an uphill and unsupported battle in her efforts to perform her job, with animal control officers refusing to accept the new leadership.  In just one example, according to volunteers, OAS animal control officers illegally euthanized animals against Ms. Webb's orders, including those that rescue groups had agreed to adopt.

9.      Upon information and belief, Ms. Webb's attempts to punish and force out OAS officers who broke laws were stymied by the City's Employee Relations Department.  Ms. Webb was ultimately pushed out of the department by the same cadre of officers who would go on to force Ms. BonGiovanni out of her job.  OAS then operated with acting directors for approximately a year.

10.     In or about 2014, Rebecca Katz, who had run San Francisco's Animal Care & Control (San Francisco's public animal control agency) for three years, was hired to facilitate the transition of OAS to a civilian, standalone agency.  Oakland Mayor Jean Quan lauded the hire, describing Ms. Katz as a "seasoned and capable leader with experience running a successful municipal animal shelter in the heart of the Bay Area.  Oakland's

animals will benefit from her innovative approaches to enhancing animal welfare, collaborative efforts to find homes for hard-to-place animals and demonstrated success."

11.    Ms. BonGiovanni had worked for the San Francisco SPCA since approximately 2002, starting as a volunteer. She eventually decided to take a paying position at San Francisco Animal Care & Control, starting at the bottom as an Animal Control Officer and working her way up through the ranks to become a Sergeant, Lieutenant, and then Captain (Field Services Supervisor).

12.    While in San Francisco Plaintiff took law enforcement training, including on the powers of arrest, investigation of misdemeanor and felony cases, identification and collection of forensic evidence, animal control officer's tools (e.g., baton and pepper spray, tools for rescue, handcuffs, and a catchpole), and attended a "humane academy" required by San Francisco for the humane treatment of animals.

13.    For much of the three years that Director Katz was in charge of San Francisco's Animal Care & Control, Plaintiff had worked as a Captain, performing her duties in an exemplary manner and making many improvements to the training process.

14.    In 2017, Plaintiff was hired as Animal Control & Shelter Manager, responsible for oversight and training of the Animal Control Officers at Oakland Animal Services. To ensure there was no impropriety in Plaintiff's retention, and due to their prior relationship, Director Katz recused herself from the hiring process for Plaintiff's position. Plaintiff was only hired after undergoing the City's competitive selection process where it was determined by an objective panel of field professionals that Plaintiff was the best candidate for the job.

15.    Ms. BonGiovanni was excited to bring her extensive knowledge of animal control to the relatively new department to assist in training animal control officers.  However, she quickly learned that not only were officers untrained in accepted animal control procedures, they were hostile and opposed to learning from women and from those they perceived as LGBT.   For example, multiple officers refused basic instruction on even the smallest tasks, and insisted on continuing to wear their police department uniforms, even after being repeatedly told that since OAS was now a separate agency, the OPD uniform could not be worn.

16.    Shortly after joining OAS, Ms. BonGiovanni overheard officers laughing as they boasted about the many times they had reduced the prior female manager to tears and had forced her to quit.  Initially, Ms. BonGiovanni did not respond or take action. But when the same boastful conversation was repeated some months later in her presence, Ms. Bongiovanni confronted the officers, saying there was nothing funny about driving a colleague to tears.  She told the officers that bullying behavior would not be tolerated. In response, the officers, including their ringleader, Officer Olinge Lotane-Makalani, offered no response and remained silent.

17.    From the inception of her hiring in 2017, Ms. BonGiovanni attempted to correct her subordinates' behavior with trainings, which they refused to accept or follow.  Multiple officers reporting to Ms. BonGiovanni refused to adhere to department policy.  For example, officers frequently violated the law and department policy by threatening citizens with seizure of their pets, without justification or affording them due process. They acted in ways that endangered themselves and the public, and were repeatedly cruel and even sadistic towards animals in their care.  When trained on new, humane procedures, they laughed and joked about them

compared to their older, more barbaric methods. Following are just some examples:

a)      In 2019, an Oakland child received a serious dog bite from a mastiff in a home with multiple children present.  Though advised of the incident, and having received training which directed an immediate response to remove the dog from the home to prevent further injury, Officer Olinge Lotane-Makalani failed and refused to respond for hours. Another officer advised Ms. BonGiovanni that Officer Lotane-Makalani had failed to respond, and she instructed him to do so immediately. Instead of following Ms. BonGiovanni's orders, he returned to the shelter with a chicken which he euthanized, and then proceeded to spend an exorbitant amount of time cleaning and restocking his van. When confronted by another officer about the immediate need to remove the mastiff from the house, Officer Lotane-Makalani said, "Taking my time. Just taking my time." The vicious dog remained in a house with small children for eight hours after it mauled the young boy.  Due to the severity of this incident, Director Katz personally contacted the City Administrator's Office and demanded support for handling Officer Lotane-Makalani's ongoing conduct, but none was provided.

b)      After injuring a distressed dog with a catchpole, Officer Lotane-Makalani dragged her down the hallway, leaving a bloody trail from her kennel, down the corridor walls and across the floor leading to the euthanasia room which is located on the far opposite side of the shelter. This incident was witnessed by staff members who were traumatized by the abusive treatment of the animal.  Just prior to this incident the officer had attended a training conducted by Ms. BonGiovanni and the shelter veterinarian where he was instructed to pre-sedate fearful or aggressive

dogs in their kennel prior to moving them for euthanasia, but he refused to follow her training.

c)    Two officers nearly killed a kitten by administering unauthorized controlled substances in a high dose and fatal combination, when they were merely supposed to remove it from behind a dashboard where it had climbed. The kitten became comatose and nearly died as a result.  Immediately following the incident one officer lied when asked by the shelter veterinarian about which drugs were administered.  Since one of the chemicals was reversible, this omission prevented the veterinarian from taking life-saving measures.  Neither officer demonstrated remorse.

d)    Officer Olinge Lotane-Makalani refused to respond to a call to rescue a litter of week-old kittens whose mother died shortly after their birth. Instead, the officer referred the reporting party to Vector Control (even though he had repeatedly been informed, and it is public knowledge, that Vector Control does not handle domestic animals, but instead, handles nuisance wildlife, insects and rodents) and refused to rescue them as he claimed they were located in a "crawl space" and expressed fear that an earthquake might occur while he was in the crawl space rescuing them.  Hours later, when Ms. BonGiovanni discovered they were not rescued, she went to the call herself.  The kittens were under a church in an accessible area where electrical work had recently been done.  Unfortunately, due to the delay in rescue, the kittens had already suffered extreme hypothermia and had to be humanely euthanized as a result. The shelter veterinarian who had to euthanize the kittens broke down in tears when informed of the circumstances; she resigned shortly thereafter.

e)      An adult pitbull was hit by a car, and the evening, on-call officer responded to the call without uniform, without a catch-pole, and without a marked city vehicle with safety lights. The injured dog was an adult pitbull who was aggressively attempting to bite and exhibiting potentially rabid behavior. The officer used a dissembled dog crate in his vehicle to push the dog into the car and required help from citizens on the street and hospital staff to move the aggressive dog into his personal vehicle and then into the hospital.  His failures to act appropriately put the dog, citizens on scene, and hospital staff at risk of injury and, in the case of rabies, potentially death.

18.      Multiple male officers working in OAS repeatedly refused any training or discipline from women.  Daily and repeatedly, they denigrated women in various ways. For example, a male training officer claiming that female officers should stay in the office, and that "only men" should respond to field calls. Officer Ayala also told Ms. BonGiovanni that he felt the job was "too dangerous" for "the girls."

19.      Officers also blatantly abused overtime and sick leave. Ms. BonGiovanni issued an email to officers advising that all overtime must be pre-approved by management.  While this did put an immediate halt on overtime hours that OAS officers incurred, the officers became enraged that they were no longer able to simply sign themselves up for overtime pay.

20.      In performing her own duties, Ms. BonGiovanni was required to investigate her subordinates' bad behavior, and submit her findings to Director Katz.  Director Katz attempted to discipline the officers to cause correction of the behavior.  In most animal control agencies, the violations above would be grounds for termination.  Director Katz often sought

suspension so that the officer could correct their behavior and other officers would understand there were consequences.  But Director Katz did not receive support from the city's Employee Relations department, who told her repeatedly to just accept the bad conduct, and continually pressured her to withdraw and lower any discipline she wanted to impose. This contributed to the officers' conduct that evinced their belief they were "untouchable" – and further exacerbated the abuse to Ms. BonGiovanni.

21.     In retaliation against her complaints and Director Katz's request for discipline, the officers made false complaints against Ms. BonGiovanni and even against Director Katz, claiming they were victims of harassment. The male union representatives were openly hostile and threatening to female management, often sending emails with an aggressive tone and personal insults, on which officers and other staff were copied. In a discussion of Ms. Bongiovanni's attempts to hold officers accountable for violating department policy and cruelty to animals, a male union representative told OAS employees, "Fuck Denise. . . she can drop dead for all I care."  Ms. Bongiovanni complained to the City that union employees denigrated and threatened her, but the City ignored the complaints.

22.     Following attempts to discipline the officers, Ms. BonGiovanni would walk into a room and all of the officers would turn their backs on her in silence, even when she greeted them.  As she left she would hear snickering.

23.     Officers repeated the false story that Ms. BonGiovanni had only been a supervisor at San Francisco Animal Care & Control for a few months and that she had only been hired at OAS because of her "friendship" with Director Katz.  This was not true – Ms. BonGiovanni had

worked her way up from officer to Captain over a period of nearly thirteen years at San Francisco Animal Care & Control, and served as a Captain for approximately two and a half years before she was hired by an independent panel at OAS, without Director Katz' participation in the process.

24.    Officers were combative and aggressive when assigned to calls by Ms. BonGiovanni –they would argue about who would go out on a call, and when somebody would agree they would roll their eyes and finally get in a vehicle.  Officers often screamed at Ms. BonGiovanni and displayed hostile and threatening physical manners when requested to perform their duties.

25.    This combativeness extended to phone calls received on off-duty hours.  As a Field Services Manager, Ms. BonGiovanni was on-call 24/7 for emergencies after she left work for home, and for authorization for seizures of animals and hospital transport.  However, she would regularly receive calls and texts at all hours even when there was no emergency, merely for purposes of harassing her.  In addition to officer contact, police dispatch regularly contacted Ms. BonGiovanni during off-duty hours, because officers would refuse to answer the emergency phone or go on calls that dispatch assigned to them. Ms. BonGiovanni would then have to contact the officers, and they would still refuse to go.  Priority calls for aggressive, abused, sick, or injured animals were left pending for hours. Ms. BonGiovanni never claimed nor was she ever compensated with overtime for these calls, though in just one weekend, for example, she participated in nearly 100 text messages and 21 phone calls.

26.    Her subordinates' refusal to perform their jobs left Ms. BonGiovanni in a constant state of anxiety over whether members of the

public would be protected from dangerous animals, whether animals would be left suffering, or whether her staff would abuse animals in front of the public or other staff members.

27.     Even when emergencies were not involved, the failure to follow policy led to disastrous results.  For example, during the animal intake process, officers often omitted important information such as the owner's name, phone number, address, or the animal's breed, gender, age, etc., which is supposed to be recorded on a "kennel card" and placed at the kennel with the animal for identification purposes.  Even if the information was recorded, often a kennel card was not placed with the animal. Ms. BonGiovanni tried to address these issues with trainings and verbal coach and counselings.  One particular officer failed to improve his practices on intake despite repeated trainings and emails alerting him to his chronic mistakes.  He refused to take direction from Ms. BonGiovanni, and his behavior ultimately resulted in the accidental and avoidable euthanasia of a beloved family pet.

28.     Male supervising officers and other male officers were not subjected to the same treatment that Ms. BonGiovanni received, unless they showed respect for Ms. BonGiovanni and other female employees.

29.     Newly-hired officers who could not be swayed to fall in line with the male group of harassers were also subjected to relentless bullying until they complied, because the group of harassers actively discouraged new officers from developing rapport with Ms. BonGiovanni, their direct superior.  For example, Ms. BonGiovanni was once struggling to carry some heavy boxes as she walked past a group of officers who watched without offering to help.  One officer jumped up and took the boxes from Ms. BonGiovanni's arms, saying "Let me help you with that," and took the

boxes out of her arm.  One of the officers yelled, "Hey Nick, you've got something brown on your nose," to open laughter from the rest – mocking the officer for assisting with the boxes and discouraging him from offering further help.

30.    The officers also discouraged and retaliated against any reporting of their conduct.  For example, one new female officer, who complained about the department's hostile environment, was told "Snitches get ditches."  On two occasions OAS officers later put fake rats on her desk.  When this officer complained to the Assistant City Administrator, the officer was told to "thicken up."

31.    As Ms. BonGiovanni learned, the hostility and aggression stemmed from these officers' apparent entrenched misogyny and homophobia.  Correctly perceiving Ms. BonGiovanni as gay, the officers falsely accused Ms. BonGiovanni of "hating men" and being "a man-hating lesbian."  They falsely accused her of favoring a particular female officer and accused Ms. BonGiovanni of "looking at her like she's a snack," which was false and demeaning not only to Ms. BonGiovanni, but to the female officer.

32.    Multiple officers participated in this conduct, but two male officers in particular, Officer Leo Ayala and Officer Olinge Lotane-Makalani, made it their mission to create an overtly hostile work environment, targeting Ms. Bongiovanni. These particular officers were holdovers from the OPD-dominated culture and served as the "ringleaders" of the group.

33.    Ms. BonGiovanni and Director Katz (before her own departure) repeatedly complained to the City, including to the City's Employee Relations department, Assistant City Administrator Maraskeshia Smith,

and Deputy City Administrator Betsy Lake.  Ms. BonGiovanni even filed a complaint to the City's Equal Employments Investigation unit in December 2019.

34.    But **nothing** was done.  The officers remained, as they believed, "untouchable," despite their abusive conduct towards not just their colleagues, but the animals in their care.  These employees, including officers and a union steward, created and enforced a workplace culture that demeaned women and individuals identifying as LGBT, perpetuated bullying, and intimidated the few employees who objected to their behavior.

35.    When other employees complained of harassing and discriminatory conduct to Employee Relations or to the City Administrator's office, they were told to "thicken up," and to "treat your coworkers like adults and they'll act like adults," and discipline and accountability was shut down.

36.    The City allowed male union stewards and representatives, including City employees, to threaten and/or curse female managers, without recourse. Problem employees were thus emboldened to continue their harassing and dangerous conduct.

37.    In early 2020, after five years of trying to hold problem employees to account with no support from the City's management, and enduring the despicable climate of gender and sexual orientation-based discrimination, harassment, and retaliation, Director Katz resigned from Oakland Animal Services.

38.    Plaintiff BonGiovanni went out on medical leave on November 26, 2019, but remained employed.

39.     Defendant contacted Plaintiff BonGiovanni on or about October 2020 and told her that it owed her "no further obligation," and that she was being separated from service effective December 2, 2020.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Gender and Sexual Orientation Discrimination – Hostile Work Environment in Violation of

### 42 U.S.C. § 1983

### Against All Defendants

40.     Plaintiff incorporates by reference all of the allegations contained in paragraphs above with the same force and effect as if fully pleaded at length herein.

41.     This is a claim to remedy egregious discrimination in violation of the Fourteenth Amendment to the United States Constitution.

42.     Defendant City had and has a long-standing, deep-rooted policy and practice of gender and sexual orientation discrimination against its employees working in the Oakland Animal Services department, aided and abetted by personnel within the City's management structure, including but not limited to the City Administrator's office.  This includes, but is not limited to, the toleration, if not encouragement, of employees who engage in acts of egregious, open, and hostile discrimination against their female and LGBT co-workers and against female and LGBT superior officers.

43.     The Plaintiff herein has been harassed by the managerial employees of Defendant City in the following ways:

a.   Ostracism of female employees by their managers;

b.   Ostracism of LGBT employees by their managers;

c.   Failure to support female employees, by their managers;

d.   Failure to support LGBT employees, by their managers;

e.   Failure to investigate and minimizing claims of discrimination made by female employees when using the City's internal processes;

f.   Failure to investigate and minimizing claims of discrimination made by LGBT employees when using the City's internal processes;

g.   Public humiliation of female employees;

h.   Public humiliation of LGBT employees;

i.   Refusing to assess discipline against male employees for violations of policy and failure to perform standards of conduct, when recommended by female employees.

j.   Refusing to assess discipline against non-LGBT employees for violations of policy and failure to perform standards of conduct, when recommended by LGBT employees.

44.   Staff of Defendant's City Administrator's Office personally engaged in activity that had the purpose and effect of creating a hostile work environment for females and LGBT individuals by failing to discipline male, non-LGBT officers for their conduct. Then, staff and management of Defendant's City Administrator's Office purported to investigate such incidents while suppressing the evidence of gender and sexual orientation animus. Said suppressions were known to responsible City Administrator staff.

45.     Defendant City, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of gender and sexual orientation. Defendant, by and through its executives and managers, either knew about the hostile work environment and failed to take remedial action, or themselves created a hostile work environment based on gender and sexual orientation.

46.     As a result of the hostile work environment as described herein, Plaintiff has been held up to great derision and embarrassment by her fellow coworkers, friends, and members of the community. Plaintiff has suffered emotional distress because Defendant City has subjected her to a hostile work environment based on gender and sexual orientation. Plaintiff is informed and believe that Defendant City maintained such a hostile work environment, knowing that it would cause severe emotional distress. Plaintiff therefore seeks damages for such emotional distress in an amount to be proved at the time of trial.

47.     Because of the wrongful acts of Defendant City as alleged herein, Plaintiff has been and will be required to employ physicians to examine, treat and care for her and will incur additional medical and economic damages in an amount to be proven at the time of trial.

48.     In bringing this action, Plaintiff has been required to retain the services of counsel and is therefore entitled to an award of attorney fees.

## SECOND CLAIM FOR RELIEF

**Gender and Sexual Orientation Discrimination - Retaliation in Violation of 42 U.S.C. § 1983**

**Against All Defendants**

49.     Plaintiff incorporates by reference all of the allegations contained in paragraphs above with the same force and effect as if fully pleaded at length herein.

50.     This is a claim to remedy egregious discrimination in violation of the First and Fourteenth Amendment to the United States Constitution.

51.     At all times herein relevant, Defendant City has maintained and fostered a custom and practice within the Oakland Animal Services department that permits employees to harass and take other actions to punish employees from opposing unlawful employment discrimination and to deter their coworkers from taking similar action.  Said custom and practice has been aided and abetted by the personnel of the City Administrator's Office.

52.     As alleged above, the Plaintiff herein, and other female and LGBT employees, complained of unlawful employment discrimination by male and non-LGBT employees on numerous occasions by way of different means and in different forums.   In response Defendant City permitted those employees to engage in repeated and blatant acts of reprisal.

53.     Said acts of reprisal include, but are not limited to, the following:

      a.   Opening investigations against complaining employees, such as Plaintiff, for purported (nonexistent misconduct), which often includes threatening to impose discipline.  No conclusion to the investigation was ever announced nor is any discipline ever imposed but the employee is never advised that the investigation has concluded;

b.   Refusing to investigate complaints of discrimination made by employees, such as Plaintiff and other female and LGBT employees;

c.   Refusing to discipline employees who were recommended by the complaining employees (including Plaintiff) for discipline;

d.   Permitting ostracism;

e.   Permitting abusive conduct in response to Plaintiff's attempts to remedy discrimination; and

f.   Imposition of unjustified discipline.

54.   The actions described in the preceding paragraph are reasonably likely to deter employees from engaging in protected activity.

55.   As a result of the aforesaid acts of reprisal, Plaintiff has suffered and is continuing to suffer a loss of wages/salary, benefits and other employee compensation in an amount which is currently un-ascertained.  Plaintiff faces substantial diminution of her future earning capacities in an amount which is currently unascertained, but subject to proof at the time of trial.

56.   As a result of the aforesaid reprisal, Plaintiff has been held up to great derision and embarrassment with fellow workers, friends, members of the community and families, and continue to suffer emotional distress because the Defendant demonstrated to the Plaintiff and other female employees that their protected activity would be punished severely and result in further discrimination. Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiff therefore seeks

damages for such emotional distress in an amount to be proven at time of trial.

57.     In bringing this action, Plaintiff has been required to retain the services of counsel and is therefore entitled to an award of attorney fees.

### THIRD CLAIM FOR RELIEF
### Gender Harassment in
### Cal. Gov. Code § 12940(j)
### Against All Defendants

58.     Plaintiff incorporates by reference all of the allegations contained in paragraphs above with the same force and effect as if fully pleaded at length herein.

59.     Jurisdiction in this court is invoked with supplemental jurisdiction, and pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"].  Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

60.     At all times herein Defendants City have created or allowed the creation of a hostile work environment based upon the gender of Plaintiff and her female colleagues and other members of the protected class.

61.     The acts giving rise to a hostile work environment based on gender include, but are not limited to, the following:

a.      Ostracism of female employees by their managers;

b.      Refusal to follow direction of female employees;

c.      Screaming and abusive treatment of female employees;

d.   Failure for female employees to receive support from their managers for performance of their professional duties;

e.   Failure to investigate and minimizing claims of discrimination made by female employees when using the City's internal processes;

f.   Public humiliation and public disrespect of female employees;

g.   Refusing to assess discipline against male employees for violations of policy and failure to perform standards of conduct, when recommended by female employees.

62.    Employees in the Oakland Animal Services department also engaged in activity that had the purpose and effect of creating a hostile work environment based on gender through the use of misogynistic speech, tropes, and extremely negative slurs and other references to females. Then, staff and management of Defendant's City Administrator's office purported to investigate such incidents while suppressing the evidence of gender animus. Said suppression was known to responsible City Administrator's staff.

63.    Defendant City, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of gender. Defendant, by and through its executives and managers, either knew about the hostile work environment and failed to take remedial action, or themselves created a hostile work environment based on gender.

64.    As a result of the hostile work environment as described herein, Plaintiff has been held up to great derision and embarrassment by her fellow coworkers, friends, and members of the community. Plaintiff has suffered emotional distress because Defendant City has subjected her

to a hostile work environment based on gender. Plaintiff is informed and believe that Defendant City maintained such a hostile work environment, knowing that it would cause severe emotional distress. Plaintiff therefore seeks damages for such emotional distress in an amount to be proved at the time of trial.

65.     Because of the wrongful acts of Defendant City as alleged herein, Plaintiff has been and will be required to employ physicians to examine, treat and care for her and will incur additional medical and economic damages in an amount to be proven at the time of trial.

66.     In bringing this action, Plaintiff has been required to retain the services of counsel and is therefore entitled to an award of attorney fees.

## FOURTH CLAIM FOR RELIEF
### Sexual Orientation Harassment
### Cal. Gov. Code § 12940(j)
### Against All Defendants

67.     Plaintiff incorporates by reference all of the allegations contained in paragraphs above with the same force and effect as if fully pleaded at length herein.

68.     Jurisdiction in this court is invoked with supplemental jurisdiction, and pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"]. Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

69.     Plaintiff identifies as LGBT – gay. At all times herein Defendants City have created or allowed the creation of a hostile work

environment based upon the sexual orientation of Plaintiff and her other LGBT colleagues and other members of the protected class.

70.     The acts giving rise to a hostile work environment based on sexual orientation include, but are not limited to, the following:

a.     Ostracism of LGBT employees by their managers;

b.     Refusal to follow direction of LGBT employees;

c.     Screaming and abusive treatment of LGBT employees;

d.     Failure for LGBT employees to receive support from their managers for performance of their professional duties;

e.     Failure to investigate and minimizing claims of discrimination made by LGBT employees when using the City's internal processes;

f.     Public humiliation and public disrespect of LGBT employees;

g.     Refusing to assess discipline against non-LGBT employees for violations of policy and failure to perform standards of conduct, when recommended by LGBT employees.

71.     Employees in the Oakland Animal Services department also engaged in activity that had the purpose and effect of creating a hostile work environment based on sexual orientation through the use of homophobic speech, tropes, and extremely negative slurs and other references to LGBT employees.   Then, staff and management of Defendant's City Administrator's office purported to investigate such incidents while suppressing the evidence of LGBT animus. Said suppression was known to responsible City Administrator's staff.

72.     Defendant City, as alleged herein, knowingly created and/or maintained a hostile work environment on the basis of sexual orientation.

Defendant, by and through its executives and managers, either knew about the hostile work environment and failed to take remedial action, or themselves created a hostile work environment based on sexual orientation.

73.    As a result of the hostile work environment as described herein, Plaintiff has been held up to great derision and embarrassment by her fellow coworkers, friends, and members of the community. Plaintiff has suffered emotional distress because Defendant City has subjected her to a hostile work environment based on sexual orientation. Plaintiff is informed and believe that Defendant City maintained such a hostile work environment, knowing that it would cause severe emotional distress. Plaintiff therefore seeks damages for such emotional distress in an amount to be proved at the time of trial.

74.    Because of the wrongful acts of Defendant City as alleged herein, Plaintiff has been and will be required to employ physicians to examine, treat and care for her and will incur additional medical and economic damages in an amount to be proven at the time of trial.

75.    In bringing this action, Plaintiff has been required to retain the services of counsel and is therefore entitled to an award of attorney fees.

## FIFTH CLAIM FOR RELIEF

**Failure to Prevent Employment Discrimination & Harassment**

**Cal. Gov. Code § 12940(k)**

**Against All Defendants**

76.    Plaintiff incorporates by reference all of the allegations contained in paragraphs above with the same force and effect as if fully pleaded at length herein.

77.     Jurisdiction in this court is invoked with supplemental jurisdiction, and pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"].  Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

78.     It is unlawful for an employer in the State of California to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

79.     Defendant City was and is well aware of its obligations to prevent gender and sexual orientation discrimination and harassment in its workplace.  However, rather than take action to stop gender and sexual orientation discrimination by its employees and their managers, it has taken actions that appear *aimed* to accomplish such goals, such as purporting to investigate and providing a forum for complaints, but which do nothing and in fact, have the opposite effect of causing employees to double down on their behavior without any accountability whatsoever. The purpose of such reporting process is and was fraudulent, a fact that these Plaintiffs and other females employed by Defendant City can attest.

80.     Plaintiffs and other females have repeatedly and persistently complained to Defendant City about gender and sexual orientation discrimination and harassment in the workplace. In response, has come mealy mouthed instructions to Plaintiff and other female employees to "thicken up" and minimization of the extent of the problem, and closure of complaints, but no action to assure equality of opportunity and a workplace free of gender and sexual orientation hostility.

81.     Defendant City has not taken the steps necessary to prevent gender and sexual orientation discrimination and harassment in the workplace.  Evidence of this failure is seen in the repeated and continuing refusal of the City to support female employees in their efforts to assert control over misogyny, homophobia, cruelty, brutality, hostility, and aggression displayed by males in the Oakland Animal Services department, and the City's refusal to discipline male officers who display hostility, aggression, disrespect, and failure to follow recognized protocol, when they are recommended for discipline by female employees.

82.     As a result of the failure by Defendant City to prevent gender and sexual orientation discrimination and harassment, Plaintiff has suffered and is continuing to suffer a loss of wages/salary, benefits, and other forms of compensation in an amount which is currently unascertained.  Plaintiff will therefore request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

83.     As a result of the hostile work environment as described herein, Plaintiff has been held up to great derision and embarrassment by her fellow coworkers, friends, and members of the community. Plaintiff has suffered emotional distress because Defendant City has subjected her to a hostile work environment based on sexual orientation. Plaintiff is informed and believe that Defendant City maintained such a hostile work environment, knowing that it would cause severe emotional distress. Plaintiff therefore seeks damages for such emotional distress in an amount to be proved at the time of trial.

84.     Because of the wrongful acts of Defendant City as alleged herein, Plaintiff has been and will be required to employ physicians to examine, treat and care for her and will incur additional medical and economic damages in an amount to be proven at the time of trial.

85.     In bringing this action, Plaintiff has been required to retain the services of counsel and is therefore entitled to an award of attorney fees.

## SIXTH CLAIM FOR RELIEF

### Retaliation -FEHA, Cal. Gov. Code § 12940(h)

### Against All Defendants

86.     Plaintiff incorporates by reference all of the allegations contained in paragraphs above with the same force and effect as if fully pleaded at length herein.

87.     Jurisdiction in this court is invoked with supplemental jurisdiction, and pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"].  Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

88.     At all times herein relevant, Plaintiff's job performance was always satisfactory and was usually excellent.

89.     Plaintiff opposed the unlawful gender and sexual orientation discrimination and the City's failure to discipline employees who engaged in it on multiple occasions.

90.     At all times herein relevant, Defendant City has maintained and fostered a custom and practice within City Administrator's office that permits employees to retaliate against employees who oppose unlawful employment discrimination and to deter their coworkers from taking

similar action.  The City has also maintained and fostered a custom and practice within the City Administrator's Office that permits employees to retaliate against supervisorial employees who attempt to impose discipline for violations of law and City policy and failure to adhere to standards of conduct applicable to animal control officers.

91.    As alleged above, the Plaintiff herein has complained of unlawful employment discrimination and retaliation on numerous occasions by way of different means and in different forums.  In response Defendant City has engaged in repeated and blatant acts of reprisal.

92.    Said acts of reprisal include, but are not limited to, the following:

   a.    Opening investigations against complaining employees, such as Plaintiff, for purported (nonexistent misconduct), which often includes threatening to impose discipline.  No conclusion to the investigation was ever announced nor is any discipline ever imposed but the employee is never advised that the investigation has concluded;

   b.    Refusing to investigate complaints of discrimination made by employees, such as Plaintiff and other female and LGBT employees;

   c.    Refusing to discipline employees who were recommended by the complaining employees (including Plaintiff) for discipline;

   d.    Permitting ostracism;

   e.    Permitting abusive conduct in response to Plaintiff's attempts to remedy discrimination; and

      f.      Imposition of unjustified discipline.

93.    As a result of the aforesaid acts of retaliation, Plaintiff has suffered and is continuing to suffer a loss of wages/salary, benefits, and other forms of compensation in an amount which is currently unascertained.  Plaintiff will therefore request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

94.    As a result of the aforesaid retaliation, Plaintiff has been held up to great derision and embarrassment with fellow workers, friends, members of the community and family, and continues to suffer emotional distress because Defendant City has demonstrated to Plaintiff that it would not recognize nor accept her rights as an employee because, rather than ceasing to engage in unlawful employment practices, instead it openly permitted reprisal against Plaintiff.  Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress.  Plaintiff therefore seeks damages for such emotional distress in an amount to be proven at time of trial.

95.    Because of the wrongful acts of Defendant City as alleged herein, Plaintiff has been and will be required to employ physicians to examine, treat and care for her and will incur additional medical and economic damages in an amount to be proven at the time of trial.

96.    In bringing this action, Plaintiff has been required to retain the services of counsel and is therefore entitled to an award of attorney fees.

## SEVENTH CLAIM FOR RELIEF

### Disparate Treatment – Gender - FEHA, Cal. Gov. Code § 12940(h)
### Against All Defendants

97.      Plaintiff incorporates by reference all of the allegations contained in paragraphs above with the same force and effect as if fully pleaded at length herein.

98.      Jurisdiction in this court is invoked with supplemental jurisdiction, and pursuant to California Government Code § § 12900, 12921, 12926, 12940 and 12965 [Collectively referred to as "FEHA"].  Defendant City is not exempted from the statutes cited in this paragraph by any local, state or federal laws.

99.      At all times herein relevant, Plaintiff's job performance was always satisfactory and was usually excellent.

100.      Plaintiff believes and thereon alleges that her gender was a substantial motivating factor in Defendant's discrimination against her, as set forth herein. Such actions are in violation of Government Code § 12940(a).  At all relevant times mentioned herein, Defendant had a practice of failing to treat Plaintiff, as a woman, and other women, in an equitable fashion and thereby wrongfully discriminated against Plaintiff. Such practices of Defendant included the following:

> a.   Opening investigations against complaining employees, such as Plaintiff, for purported (nonexistent misconduct), which often includes threatening to impose discipline. No conclusion to the investigation was ever announced nor is any discipline ever imposed but the employee is never advised that the investigation has concluded;

    b.    Refusing to investigate complaints of discrimination made by employees, such as Plaintiff and other female and LGBT employees;

    c.    Refusing to discipline employees who were recommended by the complaining employees (including Plaintiff) for discipline;

    d.    Permitting ostracism;

    e.    Permitting abusive conduct in response to Plaintiff's attempts to remedy discrimination; and

    f.    Imposition of unjustified discipline.

101.    As a result of the aforesaid acts of discrimination, Plaintiff has suffered and is continuing to suffer a loss of wages/salary, benefits, and other forms of compensation in an amount which is currently unascertained. Plaintiff will therefore request leave of the court to amend this Complaint to state the amount of all such damages when they have been ascertained or upon proof at the time of trial.

102.    As a result of the aforesaid retaliation, Plaintiff has been held up to great derision and embarrassment with fellow workers, friends, members of the community and family, and continues to suffer emotional distress because Defendant City has demonstrated to Plaintiff that it would not recognize nor accept her rights as an employee because, rather than ceasing to engage in unlawful employment practices, instead it openly permitted reprisal against Plaintiff. Defendant City acted unreasonably because it knew and/or should have known that its conduct was likely to result in additional, severe mental distress. Plaintiff therefore seeks

damages for such emotional distress in an amount to be proven at time of trial.

103.    Because of the wrongful acts of Defendant City as alleged herein, Plaintiff has been and will be required to employ physicians to examine, treat and care for her and will incur additional medical and economic damages in an amount to be proven at the time of trial.

104.    In bringing this action, Plaintiff has been required to retain the services of counsel and is therefore entitled to an award of attorney fees.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment as follows:

(1)    Compensatory damages according to proof;

(2)    Emotional distress damages according to proof;

(3)    Back pay;

(4)    Front pay;

(6)    Injunctive Relief;

(7)    Punitive and exemplary damages according to proof;

(8)    Reasonable Attorney fees pursuant to Cal. Gov. Code § 12965(b);

(9)    Expert witness fees pursuant to California Gov Code § 12965(b); and

(10)   Costs of Suit.

Date: **2.22.21**

LAW OFFICES OF JOSEPH L.
ALIOTO & ANGELA ALIOTO

_____
Angela Alioto
*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues triable as a right by jury.

Date: **2.22.21**

LAW OFFICES OF JOSEPH L.
ALIOTO & ANGELA ALIOTO

_____
Angela Alioto
*Attorneys for Plaintiff*